## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KATHERINE KOVELESKI

      *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

      *Defendant*.

_____/

CASE NO. 19-13457

HON. PAUL D. BORMAN
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 14)

## I.    RECOMMENDATION

Plaintiff Katherine Koveleski challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The case was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 11), **GRANTING** the Commissioner's motion, (ECF No. 14), and **AFFIRMING** the Commissioner's final decision.

## II.   **REPORT**

### A.   **Introduction and Procedural History**

Plaintiff's application for DIB was filed on December 9, 2016. (ECF No. 8-5, PageID.149–50.) For the purposes of DIB, she alleged she became disabled on August 1, 2014. (*Id.*) The Commissioner denied the claim. (ECF No. 8-4, PageID.101–05.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on June 28, 2018. (ECF No. 8-2, PageID.55–89.) The ALJ issued a decision on October 15, 2018, finding that Plaintiff was not disabled. (*Id.* at PageID.36–49.) The Appeals Council denied review on September 20, 2019. (*Id.* at PageID.25–27.) Plaintiff sought judicial review on November 22, 2019. (ECF No. 1, PageID.1–3.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 11, 14.)

### B.   **Standard of Review**

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high . . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C.     Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our

3

listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 8-2, PageID.48.) At step one, the ALJ found Plaintiff last met the insured status requirements on December 31, 2016. (*Id.* at PageID.41.) Plaintiff had not engaged in substantial gainful activity from the alleged onset date of August 1, 2014 through her date of last insured. (*Id.*) At step two, the ALJ concluded that Plaintiff's severe impairments were pelvic pain status post hysterectomy and hypertension with headaches. (*Id.* at PageID.42.) These impairments did not meet or medically equal a listed impairment at step three. (*Id.*) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(h) except no work with hazards including work at unprotected heights or around dangerous machinery, and no climbing of any ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs; no more than occasional balancing, stooping, kneeling, or crouching; no crawling; no driving in the course of employment or use of foot controls; no concentrated exposure to dust, fumes, odors, humidity, wetness, or temperature extremes; and a sit/stand option whereby work can be performed either sitting or standing and allowing for a change of position every 30 minutes.

(*Id.*) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.47.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy. (*Id.*) This included information clerk, inspector, bench assembler, reception clerk, general office clerk, and sorter. (*Id.* at PageID.48.) Accordingly, Plaintiff was found to be not disabled. (*Id.*)

E.    **Administrative Record**

1.    **Overview of Medical Evidence**

a.    **Treatment Notes**

In May 2014, Plaintiff complained of a sore throat. (ECF No. 8-8, PageID.414.) Also, the record here indicated a medical history that included endometriosis, hypertension, ovarian cyst, sore throat, and a risk of falling. (*Id.* at PageID.415.) Plaintiff had a surgical history of laparoscopies, reconstruction of ACL, and childbirth. (*Id.* at PageID.415–16.) Plaintiff's physical exam showed normal systems. (*Id.* at PageID.416.)

In October 2014, Plaintiff was monitored following a non-reactive nonstress test while pregnant. (*Id.* at PageID.456.) Plaintiff denied headache at that time, but she had headache earlier in the pregnancy. (*Id.*) She denied abdominal pain. (*Id.*) Her blood pressure was 131/75, and she had an otherwise normal physical exam. (*Id.*) Plaintiff was counseled on medication and activities, and she was okayed for discharge. (*Id.* at PageID.457.)

In April 2016, Plaintiff underwent a hysterectomy. (ECF No. 8-8, PageID.425–32.) At the time, Plaintiff's chief complaint was bilateral pelvic pain and laparoscopically proven endometriosis. (*Id.* at PageID.425.) Plaintiff's physical examination at the time showed some tenderness to deep palpation of the lower quadrants of her abdomen. (*Id.* at PageID.427.) Plaintiff's blood pressure was 150/100. (*Id.* at PageID.426.) Plaintiff had an otherwise normal general appearance, head, chest, heart rate, and extremities. (*Id.* at PageID.426–27.)

In August 2016, Plaintiff reported to the emergency department of St. Joseph Mercy Hospital. (*Id.* at PageID.484.) Her chief complaints included uncontrolled hypertension, chest discomfort, back pain, lightheadedness, dizziness, and headaches. (*Id.*) Plaintiff's reported history included her various treatments for hypertension, her history of migraine headaches, her 3-week-old upper back pain, and her intermittent numbness in both hands. Plaintiff denied abdominal pain, shortness of breath, congestion, and any focal weakness. (*Id.* at PageID.484–85.) Plaintiff's physical examination showed normal systems for general appearance, head, neck, lungs, heart, abdomen, musculoskeletal, and neurological. (*Id.* at PageID.486.) Plaintiff's blood pressure was 138/92 and pulse was 70. (*Id.*) Plaintiff's CT scan of her head was negative for acute intracranial process, and a CT scan of her chest was negative for any aortic aneurysm. (*Id.* at PageID.485.) After Plaintiff was admitted to the hospital, she was discharged as improved two days later. (*Id.* at PageID.482.) Plaintiff was prescribed lisinopril for her regimen and other medications were discontinued. (*Id.*)

In November 2016, Plaintiff was referred to Nephrology Associates of Michigan to address uncontrolled hypertension. (ECF No. 8-7, PageID.384.) Plaintiff stated her history of high blood pressure, and she was taking heavy dosages of NSAIDs, including 800 mg of Motrin up to five times per day, but this had ended by August 2016. (*Id.*) She reported her medications have not controlled her hypertension. (*Id.*) She followed a low-sodium diet that she cooks from scratch. (*Id.*) She felt tired during the day, and she complained of five to six watery diarrheas over the last few months. (*Id.*) Plaintiff had a normal physical examination. (*Id.* at PageID.385.) The recommendation, here, included modifying her medication and testing for her condition. (*Id.* at PageID.386.) A follow-up appointment in

January 2017 showed Plaintiff's complaints of feeling tired in general. (*Id.* at PageID.387.) She was running around with three kids, and she did yoga three times a week. (*Id.*) Plaintiff had a normal physical examination. (*Id.* at PageID.388.) Her chronic diarrhea etiology was unclear. (*Id.* at PageID.389.) The doctor's recommendation included modification of medication and advice of diet and weight loss. (*Id.* at PageID.388.)

Plaintiff had a number of appointments at IHA Family & Internal Medicine. Plaintiff reported issues of cough and upper respiratory infection (ECF No. 8-7, PageID.280; November 2014); chronic hypertension and intermittent bilateral shoulder pain that radiates down her arms (*id.* at PageID.368; March 2015); chronic hypertension, skin bumps, intermittent headaches (*id.* at PageID.373; September 2015); sore throat (*id.* at PageID.267; October 2015); cold symptoms (*id.* at PageID.272; December 2015); headaches, fatigue, and shoulder pain (*Id.* at PageID.317; March 2016); and chronic hypertension (*id.* at PageID.309, 317, 325, 333, 350, 359; March, August, September, and October 2016). But, at other times, Plaintiff denied chest pain, fatigue, or medication side-effects. (*See*, *e.g.*, *id.* at PageID.309, 314, 317, 347, 359, 373.) Plaintiff experienced headache, fatigue, and shoulder/neck pain. (*See*, *e.g.*, *id.* at PageID.325, 333, 350.) Plaintiff experienced numbness and tingling in her arms. (*Id.* at PageID.368.)

Plaintiff had physical exams with reports of mild tenderness in the lower back and decreased sensation in the lower back. (*Id.* at PageID.368.) Plaintiff's muscle strength was 5/5 bilaterally in her upper extremities. (*Id.*) Plaintiff's deep tendon reflexes for her right biceps and brachioradialis were 1+ and 2+ for both on left. (*Id.*) Plaintiff had instances of

generally normal physical examinations[1]. (*Id.* at PageID.263, 270, 278, 315, 323, 331, 339, 348, 357, 365.)

About six months later, Plaintiff had medical records from the Michigan Medicine of the University of Michigan. (ECF No. 8-9, PageID.657–736.) In May 2017, she reported her hypertension issues became worse with each pregnancy, but it was controlled with Norvasc medication. (*Id.* at PageID.657.) Plaintiff also reported issues about gastrointestinal problems and difficult-to-control blood pressure issues within the last six months. (*Id.*) The record also indicated Plaintiff "feels quite well" (*Id.*) Plaintiff had a normal physical exam. (*Id.*) In September 2017, Plaintiff reported abdominal pain. (*Id.* at PageID.659.) She reported a history of 13–14 surgeries for endometriosis. (*Id.*) Also, Plaintiff's hysterectomy in April 2016 resolved her pain until about three months earlier. (*Id.*) Plaintiff had a normal physical exam, except for tenderness noted in the abdomen. (*Id.* at PageID.662.) The doctor reviewed medication, physical therapy, and non-surgical options to consider with Plaintiff's pelvic-related pain. (*Id.* at PageID.663.)

In September 2017, Plaintiff was evaluated at the University of Michigan Urology Clinic for interstitial cystitis; the recommendations for Plaintiff included physical therapy, diet alterations, and medication. (*Id.* at PageID.664–69.) Plaintiff received physical therapy treatment; early on, Plaintiff reported increased abdominal/bladder pains, but Plaintiff eventually experienced decreased symptoms of back pain and pulling. (*Id.* at PageID.679,

---

[1] Generally, these examinations included general appearance, respiratory, cardiovascular, abdomen, musculoskeletal, neurological, and psychiatric. Every examination did not consistently include every system.

681, 691, 694, 696.) She noticed great improvement with her bladder symptoms, and she found physical therapy helpful. (*Id.* at PageID.701.) Plaintiff was receptive and motivated for treatment. (*Id.* at PageID.679, 681, 691, 694, 696, 716, 721, 724.) Plaintiff was also evaluated by the University of Michigan Chronic Pelvic Pain Consultative Clinic. (*Id.* at PageID.700.) Plaintiff had a normal physical examination, except Plaintiff had tender left lumbar paraspinous muscle palpation. (*Id.* at PageID.704.) The assessment of Plaintiff recorded that her pain was related to issues of endometriosis, myofascial pain, irritable bowel syndrome, neuropathic pain, and pelvic adhesions. (*Id.* at PageID.705–06.) The recommendations for her included medication, continuing physical therapy, and continue gastroenterology evaluation. (*Id.* at PageID.706. *See also id.* at PageID.709.) Plaintiff returned to physical therapy with continued abdominal and pelvic pain in February 2018. (*Id.* at PageID.716.) Plaintiff's restrictions improved with stretching and massage. (*Id.* at PageID.719.) Plaintiff reported that she has been doing pretty good without bad days in the last few weeks. (*Id.* at PageID.718.) She also reported continued minimal improvement. (*Id.* at PageID.724.) Finally, Plaintiff felt there was limited improvement in her symptoms in March 2018. (*Id.* at PageID.730.) More than four months later, Plaintiff returned to Michigan Medicine with issues of abdominal pain and altered bowel movements. (*Id.* at PageID.731.) She had a normal physical exam. (*Id.* at PageID.732–33.) The plan for Plaintiff included medication, diet, and reviewing records and laboratory reports. (*Id.* at PageID.733.)

### b.     Tests

In August 2014, Plaintiff had an ultrasound of her abdomen. (ECF No. 8-8, PageID.475.) The impressions showed a normal gallbladder, a normal liver, the spleen was not enlarged, the kidneys had no abnormality, and an unremarkable pancreas. (*Id.*)

In August 2016, following Plaintiff's reports of chest pain, Plaintiff underwent a myocardial perfusion SPECT exam. (*Id.* at PageID.506–07). The findings were normal myocardial perfusion, normal wall motion, and normal ejection fraction. (*Id.* at PageID.506.) An x-ray at this time showed no acute cardiopulmonary disease and an unremarkable cardiopericardial silhouette. (*Id.* at PageID.505.) A CT scan of her head showed no acute intracranial abnormality. (*Id.* at PageID.504.) A CT scan of her chest showed no acute aortic syndrome and no central pulmonary embolism. (*Id.* at PageID.503.)

### c.     Opinion

The state agency doctor that evaluated Plaintiff's case determined that Plaintiff was not disabled. (ECF No. 8-3, PageID.98.) The Doctor found that Plaintiff's medically determinable impairments (hypertension, obesity, motor neuron disorder, depressive disorder) were not severe. (*Id.* at PageID.97.) There was no RFC with the doctor's evaluation. (*Id.* at PageID.98.)

### 2.     Application Reports and Administrative Hearings

### a.     Function Report

Plaintiff completed a function report on February 6, 2017 for her application for DIB. (ECF No. 8-6, PageID.206.) Plaintiff lived in a home with her family. (*Id.* at PageID.199.) Plaintiff stated her conditions affected her ability to work because she had

high blood pressure that was not controlled with medication, she had headaches almost daily, and she had to lay down several times a day. (*Id.*)

Plaintiff explained her daily activities included getting her daughters to school, playing with her two-year-old, and doing household chores. (*Id.* at PageID.200.) Plaintiff slept in the afternoon. (*Id.*) She made dinner, while her husband took care of things that Plaintiff could not do earlier. (*Id.*) Plaintiff has three children and two small dogs. (*Id.*)

Plaintiff had no problems with personal care. (*Id.*) She did not need reminders for personal care or to take medicine. (*Id.* at PageID.201.) Plaintiff could make simple meals for her family when she feels okay. (*Id.*) She usually prepared meals daily unless her headaches were too bad. (*Id.*) Plaintiff cleaned the inside of the house and does laundry, for one to two hours per day. (*Id.*) She had help from her husband, as he carried laundry up and down the stairs. (*Id.*)

Plaintiff went outside daily, and she could walk and drive/ride a car. (*Id.* at PageID.202.) She shopped via computer or phone or in stores. (*Id.*) She usually grocery shopped for household necessities, and she did this by ordering online and pickup, or by going to the store for about 30 minutes per week. (*Id.*)

Plaintiff could pay bills, count change, handle a savings account and checkbook. (*Id.*) This did not change with her condition. (*Id.* at PageID.203.)

Plaintiff's hobbies included reading, doing crafts, riding her bike, playing with her kids, and yoga. (*Id.*) She tried to do these daily, but sometimes she cannot. (*Id.*) With her condition, she did these same things, just not as often. (*Id.*)

Plaintiff spent time with others; for example, she was with her husband and kids daily, and she saw her parents, sister, or in-laws about two to three times per week. (*Id.*) She did not have problems getting along with family or friends. (*Id.* at PageID.204.)

Plaintiff stated her condition affected her ability to lift, stand, walk, climb stairs, remember, and concentrate. (*Id.*) She further stated that her condition limits how long she can do those things to about 30 minutes. (*Id.*) Plaintiff could follow written or spoken instructions, but she did not always finish what she starts. (*Id.*)

Plaintiff could get along well with authority figures. (*Id.* at PageID.205.) She did not handle well either stress or changes in routine. (*Id.*)

Plaintiff stated her medication had side-effects that include headaches, fatigue, and stomach pain. (*Id.* at PageID.206.)

### b.    Third-Party Function Report

Plaintiff's husband Michael completed a third-party function report with Plaintiff's application. (*Id.* at PageID.186–93.) He stated Plaintiff had uncontrollable blood pressure that caused severe exhaustion, lapses in concentration, and headaches. (*Id.* at PageID.186.) Plaintiff had to rest or nap throughout the day. (*Id.*) Plaintiff cared for their children by getting them ready for and getting them to school, and she watched their two-year-old. (*Id.* at PageID.187.) Michael said, before Plaintiff's current condition, she was more active, and she had a lot of energy. (*Id.*) Plaintiff had no problem with personal care. (*Id.*) Plaintiff made meals that are easy and quick. (*Id.* at PageID.188.)

Plaintiff did some laundry and cleaning but will rest when her blood pressure is an issue. (*Id.*) She could go outside, drive, and shop. (*Id.* at PageID.189.) She could manage

money. (*Id.*) Her hobbies included reading, walking, and running, but the walking/running had been reduced with her condition. (*Id.* at PageID.190.) She visited her friends and parents in person or by the phone. (*Id.*) She went to their daughters' sport and school events. (*Id.*)

He stated Plaintiff's condition limited her ability to lift, squat, walk, climb stairs, complete tasks, and concentrate. (*Id.* at PageID.191.) Plaintiff could follow written and spoken instructions. (*Id.*) She got along with authority figures. (*Id.* at PageID.192.) Michael stated when Plaintiff's blood pressure had stayed high, Plaintiff became short-fused and was tired all the time. (*Id.*)

Plaintiff took medication that had side-effects for Plaintiff where she had headaches, she was fatigued, and she would have stomach pains. (*Id.* at PageID.193.)

### c.     Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified at the hearing that she was born May 12, 1979, and she has some years of a college education. (ECF No. 8-2, PageID.57.) She was not currently working. (*Id.*) She described her work history that included positions of trainer, office work, data entry, and manager. (*Id.* at PageID.58–61.)

Plaintiff explained she stopped working in August 2014 because of events where she was pregnant, she was on maternity leave, her employer was bought out by another, and her position's duties had changed. (*Id.* at PageID.61–62.) She stated she planned to return if the position remained the same. (*Id.* at PageID.62.) But Plaintiff also explained that her high blood pressure became an issue with her pregnancy; it was not controlled with medication, and she was put on bed rest. (*Id.*) Later, her high blood pressure was controlled

with a medication. (*Id.* at PageID.63.) Plaintiff also had a history of endometriosis and ovarian cysts since she was 11 years old. (*Id.*) The ALJ and Plaintiff noted a history of surgeries, medications, and therapies, and Plaintiff stated a blood test showed possibility of problems with her kidneys. (*Id.*) Plaintiff's pain continued after a hysterectomy. (*Id.* at PageID.64.)

Plaintiff stated her pain medications included 800 milligrams of Motrin up to four times a day and Norco a couple of times per week. (*Id.* at PageID.65–66.) She used a TENS machines for low back pain. (*Id.* at PageID.66.) Plaintiff continued to have recurring headaches, where the pain is 2/10 to 5/10. (*Id.* at PageID.67.) Plaintiff's husband asserted that her headache pain is more like 5/10 to 8/10 because of her persistent pain and she downplays things. (*Id.* at PageID.67–68.) Her low-back pain was reported between 3/10 and 9/10. (*Id.* at PageID.69.)

Plaintiff's typical day included making breakfast and lunch for her kids and getting them to school. (*Id.* at PageID.68.) She tried to do chores. (*Id.*) She tried to take her three-year-old child outside. (*Id.*) She picked up the kids from school and prepared dinner. (*Id.*) When her husband returns, she would either lay down with a heating pad or use the TENS machine. (*Id.* at PageID.68–69.) These activities are limited at times by her pain. (*Id.* at PageID.68.)

Plaintiff reported problems of fatigue, headaches, and nausea. (*Id.* at PageID.69.) She can handle between one to four hours of activity per day. (*Id.*) She believed that she cannot return to work because of pain, first, and then fatigue. (*Id.*) Plaintiff stated she had 15 surgeries, the most recent one was to treat the endometriosis and relieve pain. (*Id.* at

PageID.71.) Before a hysterectomy in 2016, Plaintiff would have pain relief for about six to 12 months following laparoscopies. (*Id.* at PageID.72.)

Plaintiff could sit for a couple of hours before getting up or laying down. (*Id.* at PageID.77.) She could stand for an hour or two before sitting down. (*Id.*) Plaintiff could walk a couple of blocks before stopping. (*Id.*) She did not state a limitation to lifting anything. (*Id.* at PageID.77–78.) Plaintiff still drives. (*Id.* at PageID.78.)

### d.  The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ inquired of the VE about the following hypothetical, assuming Plaintiff's age, education, and work experience:

> Please assume an ability for a light level work, but this person should not be exposed to work hazards, including work at unprotected heights or around dangerous moving machinery. No climbing of any ladders, ropes or scaffolds. No more than occasional climbing of ramps or stairs and of course, occasional is defined by Social Security as from very little to up to one-third of the workday. No more than occasional balancing, stooping, kneeling, crouching. No crawling. No driving in the course of employment or use of foot controls. No concentrated exposure to dust, fumes, odors, humidity or wetness and no exposure to temperature extremes. And also, add a need for a sit/stand option that would allow the worker to come to work either in a sitting or a standing position, allow for a change of position every 30 minutes.

(*Id.* at PageID.84–85.) The VE indicated these limitations would preclude the past relevant work. (*Id.* at PageID.85.) The VE identified other work that could be done with these limits: information clerk, inspector, and bench assembler. (*Id.*)

The ALJ inquired about the same limitations at the sedentary level. (*Id.*) The VE identified work under these limitations as reception clerk, general officer clerk, and sorter. (*Id.* at PageID.86.)

16

The VE identified that employer tolerance for absenteeism is one day or less per month. (*Id.*) Also, if an individual is off-task for 15% of the day or more, that is work preclusive. (*Id.*)

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such

as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

Plaintiff must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

According to SSR 16-3p, an ALJ must analyze the consistency of the Plaintiff's statements with the other record evidence, considering her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

### G. Arguments and Analysis

Plaintiff argues that the ALJ failed to create an accurate RFC, which lead to the error that Plaintiff could perform work at step five of the sequential evaluation. Plaintiff is incorrect.

First, to clarify a premise of Plaintiff's argument, Plaintiff asserts that the error occurred at step five of the sequential evaluation, which is the step where the burden shifts to the Commissioner to establish Plaintiff's disability status. (Pl. Br., ECF No. 11, PageID.752) However, the substance of Plaintiff's argument, which is addressed in full below, focuses on the limitations at issue in the RFC, which is a factor of step four of the evaluation. Plaintiff retains the burden of proving her disability through step four, and the ALJ is not burdened with proving the RFC at step five. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999); *see also Flynn v. Comm'r of Soc. Sec.*, 2018 WL 5306640, at *3 n.2 (E.D. Mich. 2018) ("Since the rest of this argument is entirely focused upon the supportability of the RFC, as opposed to the Step 5 analysis, the Court will treat it solely as an attack on the ALJ's underlying RFC finding"), *rep. and rec. adopted* 2018 WL 5305077 (E.D. Mich. 2018).

The failure of an ALJ to have an accurate portrayal of Plaintiff's RFC and the limitations therein is a reversable error. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009). Plaintiff now raises the following issues that lead to the ALJ allegedly failing to create an accurate RFC: the ALJ dismissed Plaintiff's complaint of

recurrent headaches; the ALJ dismissed Plaintiff's complaint of chronic fatigue; the ALJ failed to consider the side-effects of Plaintiff's medications; and the ALJ failed to include RFC limitations of off-task time and absenteeism, which would have the effect of being work preclusive. (Pl. Br., ECF No. 11, PageID.751–56.)

The nature of Plaintiff's complaints of her symptoms, by definition, are subjective. 20 C.F.R. § 404.1520(e)(i); 20 C.F.R. § 404.1529(c)(3). And "statements about your pain or other symptoms will not alone establish that you are disabled." 20 C.F.R. § 404.1529(a). Nevertheless, under the regulations, a claimant's pain or symptoms and their alleged limitations will be found to diminish the claimant's capacity for basic work activities "to the extent that [the] alleged functional limitations and restrictions due to symptoms, such as pain, *can reasonably be accepted as consistent* with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4) (emphasis added). Here, Plaintiff's argument errs to the extent that it focuses on her subjective complaints rather than her consistency, or lack thereof, with the objective medical evidence or other evidence.

Returning to Plaintiff's claims, she claims that the ALJ minimized the notation of her headaches, contrary to record evidence of her "many complaints" of recurrent headaches. (Pl. Br., ECF No. 11, PageID.753.) Plaintiff further posits that her headaches do not need to occur daily to support work restrictions, and that the ALJ did not consider that her prescription management for hypertension was equally attributable to management of her headaches. (*Id.* at PageID.754.) Plaintiff's focus on the fact that her headaches existed does not address the nature or severity of Plaintiff's headaches, except for one cited record where the headaches forced her to lie down several times a day. (*Id.* at PageID.745;

citing ECF No. 8-6, PageID.199.) The ALJ reviewed the same medical record evidence that showed periods of time of "mild and occasional headaches", "'intermittent'" headaches, and "daily headaches" around a time of hospitalization. (ECF No. 8-2, PageID.45.) Plaintiff also failed to report headaches in most of her doctor appointments. (*See, e.g.*, ECF No. 8-7, PageID.267, 272, 280, 309, 315, 384; ECF No. 8-8, PageID.456.) The ALJ concluded the "evidence tends to suggest that [Plaintiff's] headaches were not as limiting as she claims . . . ." (ECF No. 8-2, PageID.45.) Here, the record evidence supports the conclusion of the ALJ. Plaintiff does not provide support for functional limitations for her headaches beyond what the ALJ crafted in the RFC, nor did Plaintiff show that the ALJ failed to consider evidence that would support greater limitation.

Next, Plaintiff argues that the ALJ dismissed Plaintiff's chronic fatigue, where records show that Plaintiff reported either lying down throughout the day, staying in bed all day, or missing days of work. Similar to the above argument, while there is some record evidence of subjective complaints of fatigue (*see, e.g.,* ECF No. 8-7, PageID.267, 270, 325, 333, 350), there is also record evidence that show no complaints of fatigue (*see, e.g.,* ECF No. 8-7, PageID.272, 280, 309, 317; ECF No. 8-8, PageID.484, 488). The ALJ concluded that Plaintiff's fatigue complaints, along with her other complaints of pain, where not fully consistent with her claim of disabling impairment, citing a number of factors of her lifestyle that are contrary to her impairment claims[2]. (*See* ECF No. 8-2, PageID.46.) Like the above

---

[2] The Commissioner correctly points that the January 2018 record of the University of Michigan Pelvic Pain Consultative Clinic (Dr. Vilkins), where Plaintiff stated a fatigue-related limitation of missing work and staying in bed, is outside of her date of last insured, and questionable on its face. (ECF No. 8-9, PageID.701; Def. Br., ECF No. 14, PageID.784 n.2.) Plaintiff has an extended record of a lack of substantial gainful activity, and the record has no context of when the alleged limitation occurred.

argument, Plaintiff does not provide support for functional limitations for fatigue beyond what the ALJ crafted in the RFC, nor does Plaintiff show that the ALJ failed to consider evidence that would support greater limitation.

Next, Plaintiff argues that the ALJ failed to discuss and consider the record evidence that supports limitations related to Plaintiff's side-effects of her medications. Plaintiff identifies side-effects about concentration/memory, frequent bouts of diarrhea, fatigue, and headaches; but the latter two have been addressed above. Plaintiff's claims of her effects related to concentration/memory or her diarrhea are subjective. The ALJ is not required to accept Plaintiff's subjective claims. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Plaintiff does not provide objective medical evidence or opinion evidence in support of this claim. Further, Plaintiff does not address any relevant work restriction related to these limits, save for the final argument below.

Plaintiff finally argues the evidence supports work limitations that exceed the off-task time and absenteeism that is generally acceptable by employers, and that is based on evidence of her headaches, diarrhea, frequent lying down, staying in bed, her daily limit of four hours of activity, and the relevant VE testimony. Again, the ALJ is not required to accept Plaintiff's subjective claims. *Jones*, 336 F.3d at 476. Plaintiff does not cite objective medical evidence or opinion evidence in support of these limitations.

In addition, and fundamentally, Plaintiff's arguments do not address relevant issues of the substantial evidence test. Specifically, it appears that Plaintiff is inviting the reweighing of the evidence in this case, but "the court will not reweigh the evidence considered by the ALJ." *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 147066 at *2 (E.D.

Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)). Substantial evidence of an alternative conclusion in the record is not sufficient to reverse an ALJ's decision. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

Here, where no error has been found and where substantial evidence supports the ALJ's findings, the Commissioner's final decision should be affirmed.

### H.    Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 11), **GRANTING** the Commissioner's motion, (ECF No. 14), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 14, 2021                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge